1
2
3
4
5

ATTORNEY AT LAW, PC
Charles J. Sanders [Bar # 112202]
29 Kings Grant Way
Briarcliff Manor, NY 10510
Telephone: +1 914 366 6642
Facsimile: +1 347 558 9658
Email: csanderslaw@aol.com

*Attorney for Amicus Curiae Songwriters Guild of America, Inc.*

6   UNITED STATES DISTRICT COURT

7   SOUTHERN DISTRICT OF CALIFORNIA

8
9
10
11
12
13

| | |
|---|---|
| SCORPIO MUSIC (BLACK SCORPIO) S.A. and CAN'T STOP PRODUCTIONS, INC.<br><br>         Plaintiffs,<br><br>vs.<br><br>VICTOR WILLIS<br><br>         Defendant. | Case No. 3:11-CV-01557-BTM (RBB)<br><br>**MEMORANDUM OF AMICUS PARTY SONGWRITERS GUILD OF AMERICA, INC. IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION TO DISMISS COUNTERCLAIM**<br><br>Honorable Barry T. Moskowitz |

14
15
16
17
18
19
20
21
22
23
24

VICTOR WILLIS,

         Counterclaimant,

vs.

SCORPIO MUSIC (BLACK SCORPIO) S.A. and CAN'T STOP PRODUCTIONS, INC.

         Counterclaim-Defendants,

and

HENRI BELOLO

         Additional Counterclaim-Defendant.

25
26
27
28

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...................................................................................1

**ARGUMENT** ............................................................................................................2

**I.**     **Congressional Intent** ..............................................................................2

    **A.**     **Congressional Intent in the Section 203 Recapture Right** ...............2

    **B.**     **Congressional Intent in the Statute of Limitation in Section 507(b)**..............6

**II.**    **Public Policy** .........................................................................................7

**CONCLUSION** ........................................................................................................9

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2nd Cir. 2002)......................................................................5, 8

*Mills Music, Inc. v. Snyder*,
   469 U.S. 153 (1985)........................................................................................5

*Stewart v. Abend*,
   495 U.S. 207 (1990)........................................................................................5

*Stone v. Williams*,
   970 F.2d 1043 (2d Cir. 1992).........................................................................6

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)..........................................................................................6

STATUTES

17 U.S.C. § 203(b) ......................................................................... passim

17 U.S.C. §507(b) .......................................................................... passim

Pub. L. No. 349, sections 35 Stat. 1075 (1909) ...........................................3

OTHER AUTHORITIES

2 Howard B. Abrams, The Law of Copyright (2012 ED.)       3

H.R. Rep. No. 60-2222 (1909)........................................................................3

H.R. Rep. No. 94-1476 (Sept. 3, 1976) reprinted in 1976 U.S.C.C.A.N. 5659..............................5

Peter S. Menell and David Nimmer, *Judicial Resistance to Copyright Law's Inalienable Right to Terminate Transfers*, 33 Colum. J.L. & Arts 227, 227-299 (2009-2010)....................3

S. Rep. No. 85-1014 (1957) ...........................................................................6

S. Rep. No. 94-473 (Nov. 18, 1975) ..............................................................5

Staff of H. Comm. on the Judiciary, 87th Cong., Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 53 (Comm. Print 1961) ...........................................................................3-4

# PRELIMINARY STATEMENT

Imagine the unfairness to creators of a copyright law that effectively forced authors to choose between litigating co-authorship issues in commercially unproven works *ex ante* (when not only is there is no economic incentive to do so but also at a time when bringing such an action would likely destroy any practical value of the work) or forfeiting their guaranteed right to recapture their *full* rightful authorship claims upon termination (years later) under Section 203 of the Copyright Act.

Under such a legal construction, authors, who generally exchange their interests in commercially unproven works shortly after their creation for a theoretical royalty percentage, would be deprived of their rights of termination almost as a matter of course.  That is because as a practical matter, creators are in no position to enforce their rights in such works at the threshold.  They lack the financial means and incentives to bring legal challenges against well-financed publishers, record producers and other third-party interlopers over co-authorship rights in commercially untested works, and likewise understand that to do so would likely be the equivalent of withdrawing the work from the marketplace.  The result of such a legal construct would be a severe impairment of the authors' recapture right under Section 203.  Having failed to sue up front, authors would get back less than their full rightful authorship claims—notwithstanding that Congress expressly and emphatically safeguarded a full reversion.

That result, sought by Plaintiffs and Counter-claimant Defendants Scorpio Music (Black Scorpio) S.A. and Can't Stop Productions, Inc. and Counter-claimant Defendant Henri Belolo ("Movants") through an improper construction of the statute of limitations in 17 U.S.C. §507(b), would be utterly anathema to Congressional intention.  The unequivocal intent of Congress in Section 203 was to safeguard authors from unremunerative transfers and unequal bargaining

power by giving authors the ability to recapture their *full* authorship rights (35 years later) when their work's commercial value became known.

Movants' interpretation of Section 507—commencing the three-year limitations period upon creation or publication or copyright registration—thwarts this intent by gutting the authors' full reversion right.  Section 507, properly interpreted, should not even apply in the recapture context.  Congress intended Section 507 to bar belated *remedial actions*—not actions (like that here) merely seeking a declaration of co-authorship rights, with no claim for damages.  Movants' interpretation also is contrary to public policy:  (i) it is unfair because it causes authors to lose their rightful authorship claims; (ii) it is inefficient because it calls for federal courts to prematurely decide the authorship of potentially worthless copyrights; and (iii) it is counterproductive because it encourages the insertion of specious co-authorship claims that neither will be litigated *ex ante* nor vetted *ex post* upon recapture.  Nor does Movants' construction serve any public interest policy of its own.  For these reasons, amicus party Songwriters Guild of America ("SGA") respectfully urges this Court to reject Movants' construction of Section 507, and deny their Motion to Dismiss.

## ARGUMENT

### I.    Congressional Intent

#### A.    Congressional Intent in the Section 203 Recapture Right

Congress intended Section 203 to serve as an unabridgable, unalienable, and unwaivable stalwart against the inherently unlevel playing field in which authors attempt to eke out a living. A leading copyright treatise explains:

> Rarely if ever does an author realize the commercial value of his or her work alone. To realize the financial incentives the copyright system makes possible, the copyrighted work, whether it be a manuscript for a book, a script for a play or motion picture, a piece of music or another form of creative work, it must have the means to reach its potential audience.  The author may need or prefer a publisher,

producer, record company or other intermediary to reach the potential audience, and hopefully, earn the author a financial as well as psychic reward.  It is largely a buyer's market . . . .  There are more scripts than the motion picture studios can possibly turn into films, more songs and musicians than the record companies can record and more 'great American novels' than ever could ever be published.  Almost without exception only truly established and already popular creators have any significant bargaining leverage.   Due to the lack of bargaining power, often compounded by inexperience of the author and, unfortunately, the greed and overreaching of the less ethical publishers and producers, many of the contracts creators execute are less than fair.  The termination rights provided by sections 203 and 304(c) and (d) of the Copyright Act allow authors or their statutorily designated successors to reclaim some or all of the transferred or licensed rights.

2 Howard B. Abrams, The Law of Copyright § 12:1 (at 12-4) (2012 ed.)

In fact, the recapture rights in Section 203 mark Congress' second attempt to protect authors from the reality of their trade.  Under the original Copyright Act of 1909, Congress provided similar protection through a future right to renew copyright for a second term.[1] Congress intended the renewal right to be "exclusive" to authors and their families so that they "could not be deprived of this right."  H.R. Rep. No. 60-2222, at 14 (1909).  But authors rarely got what Congress intended through that right.[2]  See Peter S. Menell and David Nimmer, *Judicial Resistance to Copyright Law's Inalienable Right to Terminate Transfers*, 33 Colum. J.L. & Arts 227, 227-299 (2009-2010).  Publishers routinely required authors and their families to assign renewal rights in advance, and in 1943, the Supreme Court in *Fred Fisher Music Co., Inc. v. M. Witmark & Sons* upheld an author's assignment of the renewal right on the grounds that the statute did not explicitly make those rights inalienable.  *Id*.

---

[1]  Specifically, authors had a 28-year term of copyright protection, and held the right to renew for an additional 28 years.  Pub. L. No. 349, sections 23-24, 35 Stat. 1075, 1080-81 (1909).

[2]"The primary purpose of this [reversion] provision was to protect the author and his family against his unprofitable or improvident disposition of the copyright.  The renewal copyright was intended to revert to them so that they could negotiate new contracts for the further exploitation of the work." Staff of H. Comm. on the Judiciary, 87th Cong., Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 53 (Comm. Print 1961)

Congress set out to fix this by providing authors guaranteed rights that could not be curtailed.  In 1961, the Copyright Office submitted to Congress a comprehensive study of copyright law in order to revise the 1909 Act.  That report stated:  "[T]he revisionary feature of the present renewal system has largely failed to accomplish its primary purpose.  It has also been the source of more confusion and litigation than any other provision in copyright law."  Staff of H. Comm. on the Judiciary, 87th Cong., Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 53 (Comm. Print 1961).  The Report stated:

> [M]ost authors are not represented by protective organizations and are in a relatively poor bargaining position. . . . There are no doubt [sic] many assignments that give the author less than his fair share of the revenue actually derived from his work. Some provision to permit authors to renegotiate their disadvantageous assignments seems desirable.

*Id*. at 54.  Congress noted that the need for protection is particularly keen where authors exchange their rights for lump-sum cash:

> The situation in which authors are most likely to receive less than a fair share of the economic value of their works is that of an outright transfer for a lump sum. At the time of transfer the revenue to be derived from the work cannot ordinarily be foretold with any degree of certainty. . . . There have been many cases, however, in which authors have sold outright, for a small lump sum, their rights in a work that later proves to be highly popular and lucrative; and lump-sum transfers are still not uncommon.

*Id*. at 93. The Report concluded a new right was in order:

> Since authors are in a relatively poor bargaining position, however, we believe that some other provision should be made to permit them to renegotiate their transfers that do not give them a reasonable share of the economic returns from their works.

*Id*. at 92.

Ultimately, in the Copyright Act of 1976, Congress jettisoned the renewal right regime and adopted termination rights to ensure that authors had a non-forfeitable, second chance to reap the benefits of their commercially successful work.  The Committee Reports to the 1976 Copyright Act reflect Congress' solicitude for this right:

The provisions of section 203 are based on the premise that the reversionary provisions of the present section on copyright renewal (17 U.S.C., sec. 24) should be eliminated, and that the proposed law should substitute for the a provision safeguarding authors against unremunerative transfers.  **A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited**.  Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved.

H.R. Rep. No. 94-1476, at 124 (Sept. 3, 1976) reprinted in 1976 U.S.C.C.A.N. 5659, 5740; S. Rep. No. 94-473, at 108 (Nov. 18, 1975).  The Statute's express inalienability and unwaivability of the recapture rights manifests Congress' intent that there be no abridgment of these rights. *See, e.g., Stewart v. Abend*, 495 U.S. 207, 230 (1990) ("The 1976 Copyright Act provides . . . an inalienable termination right"); *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985)(describing Congressional intent to "relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product . . . is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself") ; *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 284-289-291 (2nd Cir. 2002)(describing legislative history of the recapture right in the context of Section 304(c)).  Indeed, Congress expressly mandated in Section 203(b) that the author recaptures nothing less than his or her entire authorship interest. "[U]pon the effective date of termination, *all rights* under this title that were covered by the terminated grants revert to the author…"  17 U.S.C. § 203(b) (emphasis added).

Movants' interpretation would turn Congressional intent on its head.  Movants would require authors—**simply to *preserve ab initio* their future rights under Section 203** (which they may or may not exercise 35 years later)—to sue up front, when authors lack both the incentive and means to do so.  Yet the legislative history (and the plain text) make clear that the recapture right serves to protect authors—not the other way around.  As the Opposition to the Motion to Dismiss explains, the recapture right will serve that purpose only if authors are

permitted to contest contrary authorship claims *ex post*, at the time of recapture—when there is a commercial incentive to do so.

### B.    Congressional Intent in the Statute of Limitation in Section 507(b)

The legislative history behind Section 507(b) likewise belies Movants' attempt to bar what simply amounts to a claim for a declaration of authorship, with no element of damages. Movants' argument that the statute of limitations accrues in the recapture context on the date of creation or publication or copyright registration not only is wrong—it also is irrelevant.  When an author exercises his or her Section 203 recapture right and contests the refusal of those rights—as Defendant and Counterclaimant Victor Willis has done here—the author simply is clarifying authorship rights on a prospective basis (to be reflected in a prospective accounting).

In that case, the legislative history of Section 507(b) makes clear that the statute of limitations has no application.  Congress emphasized in enacting the Statute that Section 507(b) was to "extend to the *remedy* of the person affected thereby, and not to his substantive rights." S. Rep. No. 85-1014, at 3 (1957) (emphasis added).   Adding that "statutes of limitations take the form of [either] a limitation upon the substantive right or upon the remedy," Congress noted that "under [this] remedial type of statute, the basic right is not extinguished, but *the limitation is applied merely to the remedy*."  *Id*. (emphasis added).  See also *Stone v. Williams*, 970 F.2d 1043, 1051 (2d Cir. 1992) ("Merely because [the plaintiff] could have brought suit in 1979 does not prevent her suit (only some of the relief sought) in 1985. To hold otherwise would ignore the long established rule that statutes of limitations bar remedies, not the assertion of rights").

This interpretation would comport with the well-established cannon of construction that courts should construe statutory language to avoid interpretations render other statutory language superfluous. *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001)—and is the only fair result leaving a meaningful termination right.

---

## II.      Public Policy

Movants' construction of Section 507(b) results in unintended consequences that clearly are contrary to public policy.  First, authors will lose rightful ownership claims, notwithstanding Congress' unmistakable attempt to guarantee those rights through Section 203.  The simple reality—as Congress acknowledged—is that authors will acquiesce rather than litigate co-authorship disputes because they have neither the means nor incentive to litigate those issues up front in the context of commercially unproven works.  Rather than getting back "all rights," as Section 203 expressly mandates, the author's reversion would be diminished by any other authorship claims—however spurious—presented at the time of creation or registration.  Relative to royalty rights (which are negotiated separately), authorship rights are of relatively little importance to authors in this context.  Indeed, as the underlying case here seemingly demonstrates, there often is little correlation between the royalty rights and the authorship rights.  See Answer and Counterclaim, DE 35, ¶ 121.  As Congress explicitly recognized, authors lack the bargaining power against publishers to resist specious co-ownership claims.  The resulting reality is that in the overwhelming vast majority of cases, authors will not vindicate their rightful authorship claims *ex ante*.  The attendant loss of rights is unfair and indefensible, and erodes authors' fundamental right to control their works.

Second, where songwriters do have the means and will to litigate up front, the courts will have to decide the authorship of untested, potentially worthless copyright interests—an inefficient and potentially meaningless exercise.  Authors will need to hire counsel—at peril of losing their rightful authorship rights—and decide whether to sue purported co-authors, long before their works even reach the market.  Should an author proceed with litigation, courts will waste judicial resources deciding who has what authorship rights in potentially worthless property.

Third, unscrupulous third parties—whether publishers, record producers or other entities seeking to deprive authors of rights to their own benefit—would be more inclined to foist spurious co-authorship claims during registration, knowing such claims will meet little or no resistance.  Author inexperience, uneven bargaining power, and the inability and disinclination to retain counsel contribute to this egregious result.  *See, e.g., Marvel v. Simon,* 310 F.3d at 290-91 (noting that if the court essentially were to give effect to "an agreement between an author and publisher that a work was created for hire . . . the termination provision would be rendered a nullity; litigation–savvy publishers would be able to utilize their superior bargaining position to compel authors to agree that a work was created for hire [thereby excepting them from the recapture provisions of section 304(c)] in order to get their works published").  Indeed, Movants' own dealings with Defendant seemingly is testament to this concern.  See Answer and Counterclaim, DE 35, ¶ 67-68, 78-91 (describing Plaintiffs' use of a "form contract" denominating Defendant as an "adapter," and denominating his works as "adapted" from "foreign works").

Finally, Movants' construction of Section 507 serves no public policy of its own.  Movants argue that their interpretation prevents resolution of authorship disputes on the basis of old evidence.  See Motion at 10-11.  Yet Movants' "evidentiary prejudice" argument is no reason to discount Congress' clear intent to safeguard the author's full reversion right.  Expressly recognizing the primacy of this safeguard, the Court in *Marvel Characters,* for example, did not hesitate to have the jury decide 60-year old factual issues regarding the scope of co-ownership rights to Captain America Comics.  310 F.3d at 292.  Nor does "repose" serve any policy in the context of recapture rights, given that recapture rights are exercised 35 years into the future.

**CONCLUSION**

For the above-cited reasons, amicus party SGA respectfully urges this Court to deny the

Motion to Dismiss.


DATED:  November 14, 2012                    Respectfully Submitted,

                                             ATTORNEY AT LAW, PC


                                             _____
                                                    /s/  Charles J. Sanders
                                             CHARLES J. SANDERS



                                             ATTORNEY AT LAW, PC
                                             Charles J. Sanders  (Bar # 112202)
                                             29 Kings Grant Way
                                             Briarcliff Manor, NY 10510
                                             Telephone: +1 914 366 6642
                                             Facsimile: +1 347 558 9658
                                             Email: csanderslaw@aol.com

                                             *Attorney for Amicus Curiae Songwriters' Guild
                                             of America, Inc.*

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on November 14, 2012, I caused the foregoing to be electronically

3    filed with the Clerk of Court using the CM/ECF system which will send notification of such

4    filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that

5    I caused the foregoing document or paper to be mailed via Federal Express to the non-CM/ECF

6    participants indicated on the Manual Notice List.

7          I certify under penalty of perjury under the laws of the United States of America that the

8    foregoing is true and correct.  Executed on November 14, 2012.

9

10                                                    /s/  Charles J. Sanders
                                             CHARLES J. SANDERS
11

12                                             Charles J. Sanders [Bar # 112202]
                                             29 Kings Grant Way
13                                             Briarcliff Manor, NY 10510
                                             Telephone: +1 914 366 6642
14                                             Facsimile: +1 347 558 9658
                                             Email: csanderslaw@aol.com
15
                                             *Attorney for Amicus Curiae*
16                                             *Songwriters' Guild of America*

17

18

19

20

21

22

23

24

25

26

27

28