# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCORPIO MUSIC (BLACK SCORPIO) S.A. and CAN'T STOP PRODUCTIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> VICTOR WILLIS, <br><br> Defendant. | Case No. 11cv1557 BTM(RBB) <br><br> **ORDER DENYING MOTION TO DISMISS COUNTERCLAIM** |
| VICTOR WILLIS, <br><br> Counterclaimant, <br><br> v. <br><br> SCORPIO MUSIC (BLACK SCORPIO) S.A. and CAN'T STOP PRODUCTIONS, INC., <br><br> Counterclaim-Defendants, <br><br> -and- <br><br> HENRI BELOLO, <br><br> Additional Counterclaim-Defendant. | |

Plaintiffs-Counterdefendants Scorpio Music (Black Scorpio) S.A. and Can't Stop Productions, Inc. ("Plaintiffs") have filed a Motion to Dismiss Counterclaim. On January 10, 2013, the Court held oral argument on the motion. For the reasons discussed below, Plaintiffs' motion is **DENIED**.

## I. BACKGROUND

This lawsuit concerns the termination by Defendant Victor Willis of his post-1977 grants of his copyright interests in certain musical compositions.

Willis is the original lead singer of the Village People. Plaintiff Scorpio Music S.A. ("Scorpio") is a French corporation engaged in the business of publishing and otherwise commercially exploiting musical compositions. Plaintiff Can't Stop Productions, Inc. ("Can't Stop") is the exclusive sub-publisher and administrator in the United States of musical compositions published and owned by Scorpio. Plaintiffs allege that between 1977 and 1979, they hired Willis to translate the lyrics of and/or create new lyrics for certain musical compositions which were owned and published in France by Scorpio. Copyright registrations for the 33 musical compositions ('Compositions") at issue, including the hit song "Y.M.C.A.," credit Willis as being one of several writers. By way of Adaptation Agreements, Willis transferred his copyright interests in the subject Compositions to Can't Stop. Can't Stop thereupon assigned to Scorpio its rights in the lyrics. The Adaptation Agreements provided that Willis would receive a set percentage (12%-20%, depending on the composition) of Can't Stop's gross receipts from exploitation of the Compositions.

In January 2011, Willis served on Plaintiffs a notice of termination of his grants of copyright with respect to the Compositions. (Ex. A to FAC).

On July 14, 2011, Plaintiffs commenced this lawsuit. In their original complaint, Plaintiffs challenged the validity of the notice of termination and sought a judgment declaring that Willis has no right, title, or interest in the copyrights to the Compositions, requiring Willis to withdraw the notice of termination, and enjoining Willis from making any claims to the Compositions' copyrights.

In an order filed on May 5, 2012, the Court granted Willis's motion to dismiss. The Court held that, contrary to Plaintiffs' contention, Willis could unilaterally terminate his grants under 17 U.S.C. § 203 because Willis granted his copyright interests in the compositions separately from the other co-authors. However, the Court granted Plaintiffs leave to amend their complaint to seek declaratory relief regarding what percentage of copyright interest Willis was entitled to receive back upon termination.

On June 5, 2012, Plaintiffs filed their First Amended Complaint, seeking a judicial determination regarding the percentage of interest in the copyrights at issue that Willis can recover upon termination. Plaintiffs contend that the correct measure of Willis's interest should be equal to the percentage Willis received in direct payments from BMI, a not-for-profit rights society which remits royalties directly to writers and publishers, or, at most, 33.3% (representing an equal share if there are 3 authors).

On August 1, 2012, Willis filed a Counterclaim. In his Counterclaim for Declaratory Relief, Willis claims that Henri Belolo did not contribute to the authorship of the lyrics or the music of 24 of the Compositions (Jacques Morali is credited with composing the music).[1] Willis claims that he is entitled to a declaratory judgment that the notice of termination is valid and that he is a 50% owner of the copyrights to the 24 works and is therefore entitled to recapture 50% of the copyright interests in the works.

## II. DISCUSSION

Plaintiffs seek to dismiss the Counterclaim on the ground that it is barred by the three-year statute of limitations set forth in 17 U.S.C. § 507(b), as well as the doctrine of laches. As discussed below, the Court finds that there is an issue of fact with respect to when Willis's claim accrued. Therefore, the Court denies Plaintiffs' motion to dismiss.

//
//

---

[1] The other 9 songs were recorded by Patrick Juvet, who also composed the music. Henri Belolo does not claim to be a co-author of these 9 works.

3                                                          11CV1557 BTM(RBB)

## A. Application of § 507(b) to Ownership Claims Raised in the Context of Termination

Under 17 U.S.C. § 507(b), "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." The timeliness of Willis's claim that Belolo is not a co-author of the disputed works (and that Willis is therefore a 50% owner of the copyrights) depends on when Willis's claim accrued.

In determining when Willis's claim accrued, the Court is guided by Zuill v. Shanahan, 80 F.3d 1366 (9th Cir. 1996). In Zuill, the plaintiff musicians claimed to be co-owners of the copyright to "Hooked on Phonics." The Ninth Circuit held that a claim for a declaratory judgment of co-ownership and the relief ancillary to such a claim is a "civil action" and, under § 507(b), "[n]o civil action shall be maintained . . . unless it is commenced within three years after the claim accrued." Id. at 1371. The court explained that "claims of co-ownership, as distinct from claims of infringement, accrue *when plain and express repudiation of co-ownership is communicated to the claimant*, and are barred three years from the time of repudiation." Id. at 1369 (emphasis added). In Zuill, express repudiation occurred four years before the law suit was filed, when Mr. Shanahan, who originally came up with the idea of "Hooked on Phonics," expressly stated in writing that he was the sole owner. Id. at 1368.

Willis's claim is a type of co-ownership claim. Willis seeks declaratory relief that he owns 50% of the copyright interests in the disputed works. Willis also seeks ancillary relief in the form of an accounting by Plaintiffs and Belolo. Accordingly, under Zuill, Willis's claim accrued when plain and express repudiation of Willis's claim to ownership of 50% of the copyright interests was communicated to Willis.

Willis disputes that his claim accrued when there was plain and express repudiation, arguing that his claim could not have accrued until he exercised his right to terminate. Under 17, U.S.C. § 203, termination of a grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant. 17 U.S.C. § 203(a)(3). To terminate a grant, a termination notice must be served on the grantee or grantee's successor not less than two nor more than ten years before the date of termination specified in the notice. 17 U.S.C. § 203(4)(A). Under § 203(b)(2), "future

rights that will revert upon termination of the grant become vested on the date of the notice of the termination has been served . . . ." Willis reasons that his right to a 50% ownership interest in the disputed works did not vest until he served the notice of termination in 2011, and that his claim could not have accrued before then.

Willis also points to the following language: "Upon the effective date of termination, all rights under this title that were covered by the terminated grants revert to the author . . . ." 17 U.S.C. § 203(b). Willis argues that upon termination, he is entitled to the recovery of "all rights" previously granted and that, therefore, the three-year statute of limitations cannot preclude his present claim that he is a 50% owner of the copyrights at issue.

Although Willis raises some interesting points, the Court does not agree that co-ownership (or sole ownership) claims raised in the context of the termination of grants accrue when the notice of termination is served. Section 203(b) does state that upon termination, "all rights" that were covered by the terminated grants revert back to the author. However, rights are not fixed, tangible objects but, rather, are privileges or claims that depend on the interpretation of laws and the rights of others. Consequently, the existence and/or parameters of rights must often be determined by a court of law. Section 203 does not say anything about *when the rights that are covered by the terminated grants must be determined*, nor does it provide for a different statute of limitations for ownership claims raised in connection with terminated grants. Accordingly, the Court concludes that when co-ownership or sole ownership claims are raised in the context of the termination of grants, § 507(b) operates as it normally does – e.g., it bars claims brought more than three years after plain and express repudiation of the ownership claim.

The fact that Willis's future rights to the disputed works vested upon service of the notice of termination does not mean that Willis could not have brought his co-ownership claim earlier. At the time Willis granted his copyright interests in the disputed works to Can't Stop, the Copyright Act of 1976 was already enacted. Therefore, Willis knew from the very beginning that he would have the opportunity to terminate his grants and could have litigated any ownership disputes of which he was aware to preserve his rights.

In Tomas v. Gillespie, 385 F. Supp. 2d 240 (S.D.N.Y. 2005), the Southern District of New York dealt with a similar argument that the vesting of renewal rights commenced the time for asserting a co-ownership claim. The plaintiff in Tomas sought a declaratory judgment that she was Dizzy Gillespie's daughter and a co-owner of renewal copyrights to works authored by Gillespie. The court determined that Tomas's claims accrued upon defendants' plain repudiation in 1993 of her claim to paternity and co-ownership, and held that her claims were therefore time-barred. Id. at 247. The court rejected Tomas's argument that "the vesting of her rights and the accrual of her related claims coincided" and that her claims were therefore timely as to the copyrights that entered renewal terms and vested within three years of the filing of her suit. Id. at 244.[2]

Willis and amicus curiae, the Songwriters Guild of America, Inc. ("SGA")," argue that even if Willis's claim accrued more than three years before filing suit, Congress intended that § 507(b) "extend to the remedy of the person affected thereby, and not to his substantive rights." S. Rep. No. 85-1014, at 3 (1957). Willis and the SGA contend that although Willis may not be able to recover monetary damages for Plaintiffs' failure to properly credit Willis over the past 35 years, Willis is not precluded from asserting his substantive right to reclaim one-half of the copyright ownership interests on a prospective basis.

The Ninth Circuit rejected an almost identical argument in Zuill. In Zuill, the plaintiffs argued that §507(b) limited their remedy, not their right to co-ownership. Id. at 1369. The Ninth Circuit explained that although §507(b) may be applied to *infringement* claims so that the remedy is limited to the prior three years without extinguishing the rights of the copyright owner, the legislative history of § 507(b) did not speak to circumstances where a plaintiff is asserting a claim for declaration of co-ownership and subsidiary remedies. Id. at 1369-70.

---

[2] Nimmer suggests that Tomas was wrongly decided because Tomas was a "total stranger" to any interest in the song until the renewal term vested in 1999. 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.05 (2012). "Generalizing from these considerations, even though a party knows the factual basis of a co-ownership claim, courts should not deem the statute of limitations to start running until the claim has matured to the point of being legally cognizable." Id. Even if Nimmer is correct, the facts before the court are different. Willis was not a "total stranger" to any interest in the works. It is possible that he was aware of Belolo's co-ownership claim from the beginning and could have challenged Belolo's status as a co-owner years ago.

Following Zuill, the Court concludes that § 507(b) would operate as a complete bar to Willis's co-ownership claim if Willis's claim was brought more than three years after it accrued.

Willis and the SGA recite policy arguments for allowing ownership claims to be brought in conjunction with the termination of grants. As discussed in the Court's prior Order, the purpose of the termination right scheme was to "safeguard[ ] authors against unremunerative transfers" and address "the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." H.R. Rep. No. 94-1476, at 124 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5740. According to Willis and the SGA, requiring authors to litigate the issue of their ownership interests at the time of creation or anytime prior to when termination rights may be exercised would be contrary to the policy behind termination rights. The SGA points out that authors often have neither the means nor incentive to litigate authorship disputes up front, and expresses concern that many authors will suffer as a result of "dirty" copyright registrations that list "authors" who did not actually contribute to the work.

Although Willis and the SGA raise legitimate policy concerns, it is Congress's job, not this Court's, to amend the law to conform to its intent. Lamie v. U.S. Trustee, 540 U.S. 526, 542 (2004). Furthermore, there are countervailing policy considerations. In Zuill, the Ninth Circuit rejected the plaintiffs' public policy argument that it makes sense to allow putative co-owners to wait to see whether there is pecuniary value to litigation before cluttering the courts with lawsuits, reasoning:

> But the court's administrative gain if lawsuits can be postponed this way is offset by the burden and deterrent to development and marketing by a co-owner. It is inequitable to allow the putative co-owner to lie in the weeds for years after his claim has been repudiated, while large amounts of money are spent developing a market for the copyrighted material, and then pounce on the prize after it has been brought in by another's effort. "Delay under such circumstances allows the [putative] owner to speculate without risk with the other's money." Haas v. Leo Feist, Inc., 234 F. 105, 108 (S.D.N.Y.1916) (Learned Hand, J.).

Id. at 1370-71. Policy arguments can also be made for avoiding the filing of lawsuits decades after the creation of a work, when witnesses may be dead, documents lost, and memories faded.

The cases upon which Willis relies are inapposite. In <u>Siegel v. Warner Bros. Ent., Inc.</u>, 542 F.Supp.2d 1098 (C.D. Cal. 2008), the focus of the case was on the validity of termination notices submitted by heirs of one of the creators of the comic book superhero "Superman," not a claim by an author regarding his percentage of ownership interest.[3] Another case cited by Willis, <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280 (2d Cir. 2002), concerned whether a transferor's termination claim under § 304(c) was barred by a settlement agreement (dated before passage of the Copyright Act of 1976) which provided that the transferor's contribution to the Captain America works in question was done as an employee for hire. The case did not address § 507(b) and the application of statute of limitations to co-ownership claims.

For the reasons discussed above, the Court holds that under <u>Zuill</u>, Willis's claim accrued when plain and express repudiation of Willis's 50% ownership claim was communicated to him. The next question to be answered is when plain and express repudiation occurred in this case.

---

[3] In footnote 7 of <u>Siegel</u>, quoted by Willis, the court reasons that the termination effective date is the accrual date in a case involving ownership by way of a termination of a grant. However, <u>Siegel</u> involved the exercise of termination rights by Siegel's widow and daughter, not Siegel himself. Their status as co-owners was predicated upon the exercise of the termination right. The court contrasted situations where a co-ownership claim is based on a party's status as an author:

> Stated another way, a party's status as a creator is a factual question subject to being challenged by the other putative co-owner at any time, and hence, the accrual date for the same would begin at that instant. The same, however, is not true of a putative co-owner by way of termination. Their status as co-owner is not predicated upon a pre-existing factual scenario, like whether they were involved in jointly creating the material per se. Instead, their status as a co-owner is predicated upon a legal mechanism-the exercise of a new statutory right revoking an earlier transfer in the copyright in question, be it one they solely or jointly created-that takes place at a certain defined point in time. Unless and until that legal triggering point is passed, there is nothing for the other co-owner to reject or challenge.

<u>Id.</u> at 1134 n.7. Willis's claim is based on a pre-existing factual scenario - his and Belolo's contributions to the joint works - even though the issue arises in the context of termination rights. If Willis knew all along that Belolo was claiming to be an author, Willis could have challenged Belolo's status as a co-owner before he exercised his termination of rights.

B. <u>Plain and Express Repudiation</u>

Plaintiffs point to copyright registration certificates, filed between 1978-1980, which identify Belolo as an author. (Plaintiffs' RJN, Ex. A.) Plaintiffs also ask the Court to take judicial notice of printed labels, which also identify Belolo as an author, on the original vinyl albums released in 1978, 1979, and 1981. (Plaintiffs' RJN, Ex. B.) According to Plaintiffs, the copyright registrations and the record labels constituted plain and express repudiation and started the running of the clock.

Some courts hold that copyright registrations give constructive notice of claims of ownership and are sufficient to commence the statute of limitations. See, e.g., <u>The Saenger Org., Inc., v. Nationwide Ins. Lic. Ass'n</u>, 119 F.3d 55 (1st Cir. 1997) (explaining that an individual claiming copyright ownership had constructive notice of another individual's claim of exclusive ownership of the copyrights as of the effective date of copyright registrations); <u>Ackoff-Ortega v. Windswept Pacific Ent.</u>, 120 F. Supp. 2d 273 (S.D.N.Y. 2000) (holding that any injury to plaintiff's status as a coauthor first occurred in August 1997, when the Copyright Office issued a supplementary registration removing plaintiff as the author of the song).

Other courts give less weight to copyright registrations. In <u>Gaiman v. McFarlane</u>, 360 F.3d 644 (7th Cir. 2004), the Seventh Circuit criticized <u>Saenger</u>'s suggestion that registration provides constructive notice of a claim of ownership. The Seventh Circuit explained that the "constructive notice" referred to in 17 U.S.C. § 205(c) is for purposes of establishing priority in the event of disputes over creditors' rights. <u>Id.</u> at 655. "A creditor who wants to know whether he can seize a debtor's copyright consults the register; a co-author does not." <u>Id.</u> The Seventh Circuit also held that copyright notices in books can affect the accrual of the action only if the victim reads it. <u>Id.</u> at 654.

The Court is not convinced that the mere filing of copyright registrations listing Belolo as an author and the release of records bearing labels identifying Belolo as an author rise to the level of "plain and express repudiation" communicated to Willis.[4] At the very least,

---

[4] In <u>Aalmuhammed v. Lee</u>, 202 F.3d 1227, 1231 (9th Cir. 1999), the Ninth Circuit explained that movie credits listing Aalmuhammed far below more prominent names as an "Islamic technical consultant" plainly and expressly repudiated his claim of authorship.

1  Plaintiffs should have to show that Willis had actual notice of the content of the registrations
2  and the record labels. What Willis knew and when he knew it are factual issues that cannot
3  be determined at this time.
4      In sum, at this point in the litigation, there are issues of fact that prevent the Court
5  from ruling upon whether Willis's counterclaim is barred by the three-year statute of
6  limitations set forth in § 507(b). As for Plaintiffs' laches argument, if Willis's counterclaim is
7  timely under § 507(b), it is unlikely that there was unreasonable delay that would support the
8  application of the equitable doctrine. Therefore, the Court denies Plaintiffs' motion.[5]

### III. CONCLUSION

11  For the reasons discussed above, Plaintiffs' Motion to Dismiss Counterclaim is
12  **DENIED**.
13  **IT IS SO ORDERED.**
14  DATED: March 4, 2013

                                           */s/ Barry Ted Moskowitz*
                                  BARRY TED MOSKOWITZ, Chief Judge
                                  United States District Court

---

However, the Ninth Circuit did not specify whether Aalmuhammed had seen the credits or had notice of them through some other means. Ultimately, the Ninth Circuit did not rely on the movie credits because that "repudiation" was less than three years before the lawsuit was filed.

[5] As noted by the Court during oral argument, it appears that Willis may be able to assert his claim as a defense to Plaintiffs' action even if his counterclaim is eventually dismissed. In Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149 (2d Cir. 2003), the Second Circuit rejected the plaintiffs' claim that the defendant was time-barred from claiming to be the author of the works in dispute because, among other things, the defendant had not made a "claim," but rather was asserting a defense to the plaintiffs' claim for renewal rights. "A defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations." Id. at 163. See also Pritchett v. Pound, 473 F.3d 217, 220 (5th Cir. 2006) (explaining that declaratory judgment action seeking declaration of sole ownership of copyrights in two books was not barred by § 507(b) because the claim was asserted as a defense to a state court action for accounting).