# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCORPIO MUSIC (BLACK SCORPIO) S.A. and CAN'T STOP PRODUCTIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> VICTOR WILLIS, <br><br> Defendant. | Case No. 11cv1557 BTM(RBB) <br><br> **ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| VICTOR WILLIS, <br><br> Counterclaimant, <br><br> v. <br><br> SCORPIO MUSIC (BLACK SCORPIO) S.A. and CAN'T STOP PRODUCTIONS, INC., <br><br> Counterclaim-Defendants, <br><br> -and- <br><br> HENRI BELOLO, <br><br> Additional Counterclaim-Defendant. | |

Plaintiffs-Counterdefendants Scorpio Music (Black Scorpio) S.A. and Can't Stop Productions, Inc. ("Plaintiffs") have filed a motion for partial summary judgment. For the reasons discussed below, Plaintiffs' motion is **DENIED**.

## I. PROCEDURAL BACKGROUND

Defendant Victor Willis ("Willis") is the original lead singer of the Village People. Plaintiff Scorpio Music S.A. ("Scorpio") is a French corporation engaged in the business of publishing and otherwise commercially exploiting musical compositions. Plaintiff Can't Stop Productions, Inc. ("Can't Stop") is the exclusive sub-publisher and administrator in the United States of musical compositions published and owned by Scorpio. Plaintiffs allege that between 1977 and 1979, they hired Willis to translate the lyrics of and/or create new lyrics for certain musical compositions which were owned and published in France by Scorpio. Copyright registrations for the 33 musical compositions ('Compositions") at issue, including the hit song "Y.M.C.A.," credit Willis as being one of several writers. By way of Adaptation Agreements, Willis transferred his copyright interests in the subject Compositions to Can't Stop. Can't Stop thereupon assigned to Scorpio its rights in the lyrics.

In January 2011, Willis served on Plaintiffs a notice of termination of his grants of copyright with respect to the Compositions. (Ex. A to FAC).

On July 14, 2011, Plaintiffs commenced this lawsuit. In their original complaint, Plaintiffs challenged the validity of the notice of termination and sought a judgment declaring that Willis has no right, title, or interest in the copyrights to the Compositions, requiring Willis to withdraw the notice of termination, and enjoining Willis from making any claims to the Compositions' copyrights.

In an order filed on May 5, 2012, the Court granted Willis's motion to dismiss. The Court held that, contrary to Plaintiffs' contention, Willis could unilaterally terminate his grants under 17 U.S.C. § 203, because Willis granted his copyright interests in the Compositions separately from the other co-authors. However, the Court granted Plaintiffs leave to amend their complaint to seek declaratory relief regarding what percentage of copyright interest

Willis was entitled to receive back upon termination.

On June 5, 2012, Plaintiffs filed their First Amended Complaint, seeking a judicial determination regarding the percentage of interest in the copyrights at issue that Willis can recover upon termination. Plaintiffs contend that the correct measure of Willis's interest should be equal to the percentage Willis received in direct payments from BMI, a not-for-profit rights society which remits royalties directly to writers and publishers, or, at most, 33.3% (representing an equal share if there are 3 authors).

On August 1, 2012, Willis filed a Counterclaim. In his Counterclaim for Declaratory Relief, Willis claims that Henri Belolo did not contribute to the authorship of the lyrics or the music of 24 of the Compositions ("24 Disputed Works") (Willis does not dispute that Morali composed the music).[1] Willis claims that he is entitled to a declaratory judgment that the notice of termination is valid, that he is a 50% owner of the copyrights to the 24 works, and that he is therefore entitled to recapture 50% of the copyright interests in each the works.

On September 17, 2012, Plaintiffs filed a motion to dismiss Willis's Counterclaim on the ground that it was barred by the three-year statute of limitations set forth in 17 U.S.C. § 507(b), as well as the doctrine of laches. In an order filed on March 4, 2013, the Court denied Plaintiffs' motion to dismiss. The Court found that there were triable issues of fact regarding when Willis's claim to 50% ownership of the copyrights to the 24 Disputed Works was plainly and expressly repudiated.

On March 29, 2013, Plaintiffs filed a motion for partial summary judgment on Willis's Counterclaim, again arguing that Willis's claim was barred by the statute of limitations. The Court held that the evidence submitted by Plaintiffs was not enough to establish a "plain and express repudiation" of Willis's claim of 50% ownership. The Court denied the motion for partial summary judgment without prejudice and instructed Plaintiffs that they were not to file a new motion for partial summary judgment until Willis had a sufficient opportunity to conduct discovery.

---

[1] The other 9 songs were recorded by Patrick Juvet, who also composed the music. Henri Belolo does not claim to be a co-author of these 9 works.

## II. DISCUSSION

Now that discovery has closed, Plaintiffs again seek partial summary judgment on Willis's counterclaim. Plaintiffs contend that Willis's claim to 50% ownership of the copyrights to the 24 Disputed Works is barred by the three-year statute of limitations as well as the doctrine of laches. As discussed below, the Court finds that there are triable issues of fact that preclude summary judgment with respect to the statute of limitations. As for Plaintiffs' laches argument, the Court denies the motion without prejudice to refiling after the Supreme Court issues a decision in Petrella v. Metro-Goldwyn-Mayer, Inc., 695 F.3d 946 (2012), cert. granted, 134 S. Ct. 50 (2013).

### A. Statute of Limitations

Under 17 U.S.C. § 507(b), "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." As discussed in the Court's prior orders, under Ninth Circuit law, "claims of co-ownership, as distinct from claims of infringement, accrue *when plain and express repudiation of co-ownership is communicated to the claimant*, and are barred three years from the time of repudiation." Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir. 1996). The Ninth Circuit compared co-ownership of a copyright with a tenancy in common in real property, where "[a]n express or implicit ouster of a cotenant by an unequivocal act of ownership starts the adverse possession statute of limitations running." Id. at 1370.

The Court has considered the evidence submitted by Plaintiffs and concludes that there are triable issues of fact regarding when Plaintiff knew he had a claim for 50% ownership of the copyrights to the 24 Disputed Work and when such claim was expressly repudiated by Belolo. Plaintiffs argue that express repudiation of Willis's claim occurred at the time the albums were released (1978-1980) because Willis admitted during his deposition that when each of the albums came out, he saw that Belolo was credited as a writer along with Morali and Willis. (Willis Dep. (attached to Besser Decl.) at 23:9-24:8.) However, Willis arguably did not know he even had a claim to 50% ownership until much

later, meaning there was no claim to repudiate at the time the albums were released.

According to Willis, he was the sole author of the lyrics to the 24 Disputed Works. (Willis Decl. ¶ 2.) He did not know exactly what Belolo's contribution to the works was because Belolo was not present when Willis, Morali, and Wilkie, a keyboard player, had writing sessions at a music studio. (Willis Dep. at 11:3-24.) Willis claims that he assumed that Belolo contributed to the creation of the *musical elements* of the 24 Disputed Works, or that Belolo and Morali, who did business together, agreed that Belolo would receive credit for the musical elements of the compositions. (Willis Decl. ¶ 5.) Willis's Declaration is consistent with his deposition testimony in which he explained:

> I didn't know what he was taking credit for. I just knew that his name was being credited as a writer and there was nothing that was given to me or shown me the breakdown to say that – that he was taking credit for doing – doing words and music. I just assumed that it had to be that he and Jacques had did some music together because they were friends, business partners, and roommates. I knew it didn't have anything to do with my writing and lyrics.

(Willis Dep. at 23:24-24:8.)

Assuming the truth of Willis's testimony, although Willis did not really know how Belolo contributed to the works, he assumed that Belolo was being credited in connection with the musical arrangement and accepted that he was one of three authors. Willis did not know that Belolo allegedly did nothing in connection with the creation of the works (and therefore had no valid authorship claim) until Belolo told Willis that he took credit for writing French lyrics to the songs, not for contributing to the musical arrangement. According to Willis, he did not know that Belolo was taking credit for lyrics until 2009, when Belolo's attorneys wrote a letter stating that the lyrics for "Macho Man," "YMCA," "In the Navy," and "Go West," were originally written in French by Belolo. (Ex. 2 to Willis Decl.)

Plaintiffs argue that Willis actually knew about Belolo's claim to have written original French lyrics by 1989. Plaintiffs rely on a letter dated June 29, 1989, from Belolo to Willis's attorney, Mr. Michael Leff, in which Belolo states that he was a "co-writer with Mr. J. Morali of a certain quantity of songs published by SCORPIO MUSIC, Mr. V. Willis was the English adaptor of some of them." (Ex. C to Belolo Decl.) Willis claims that he never saw this letter. (Willis Dec. ¶ 11). Plaintiffs counter that since Leff was acting as Willis's agent, his

knowledge should be imputed to Willis. It is true that a client is deemed to have knowledge of information that his attorney acquired within the scope of his representation and ought to have communicated to his client in the exercise of ordinary care and diligence. See Cal. Civ. Code § 2332; Freeman v. Superior Court, 44 Cal. 2d 533, 538 (1955). Here, however, the Court cannot say that Leff had a duty to convey the remark quoted above to Willis. Although the letter implies that Belolo or Morali wrote French lyrics to some unspecified songs, it does not expressly state so. Moreover, the import of the remark could have been easily overlooked because the context of the letter was a dispute regarding exploitation of the works in France and monies due to Willis, not copyright ownership. The remark was made as part of Belolo's protestations that he was just a co-author, not Willis's manager or advisor, and that Willis's complaints should be directed toward Can't Stop, with whom Willis had contracted. Accordingly, the Court will not grant summary judgment on the basis of this stray remark.

Plaintiffs also rely on Willis's deposition testimony regarding a telephone conversation he had with Morali in 1989. According to Willis, during the conversation, Morali stated that he was getting ready to sue Belolo and wanted Willis to join him. (Willis Dep. at 20:17-18.) Morali also stated that Belolo was a "crook" and a "fraud" and that he regretted allowing Belolo to be credited as a creator of the songs. (Willis Dep. at 20:19-23; 22:15-19.) Willis stated:

> [W]hat Jacques basically was saying to me was that whatever it was, this is the first time I had any idea that – that I had been affected, per se, by his name being on there and that I would be getting back – probably getting back whatever I was due from whatever it was that had been taken from me when – from Mr. Belolo's name being on there.

(Willis Dep. at 38:11-18.)

During oral argument, Plaintiffs' counsel also pointed to portions of the deposition where Willis made remarks to the effect that Willis knew that Belolo had nothing to do with the creation of the songs and that the songs were created by just himself and Morali. For example, Willis said, "I told Mr. Morali that, yes, I would – I would join on because I knew that Mr. Belolo had nothing to do with the creating of the songs because he was never there

when Jacques and I did it." (Willis dep. 22-23-23:1.) He also testified: "I didn't assume anything as far as what Mr Belolo had done with the songs. I knew Mr. Belolo hadn't done anything as far as the creation of the songs. So I was confused about why his name was even on there, but I didn't – I didn't – I didn't inquire." (Willis dep. 32:4-8.)

Although Willis's deposition testimony can be viewed as showing that Willis knew that Belolo did not contribute to creation of the works and therefore had no valid claim to copyright ownership, an argument can be made for a different interpretation. Willis may have been injecting his current feelings of certainty regarding the illegitimacy of Belolo's claim to authorship into some of his testimony regarding his past thoughts and actions. At other times during the deposition, Willis said that he knew that Belolo was not present when he and Morali were putting together the songs, so he was "confused" about why Belolo was credited, and assumed that Morali and Belolo had worked on the music together and/or Morali had agreed to give him music writing credit. (Willis dep. at 23:9-18; 23:24-24:8; 35:24-36:12).

According to Willis, during the 1989 telephone conversation, Morali confirmed to Willis that he had agreed to let Belolo be credited. (Willis Dep. 23:16-19.) However, an agreement that Belolo could receive credit does not mean that Belolo did not actually contribute in some way to the music. Because it is not always clear whether a contribution is significant enough to render the contributor an author, contributors to a work may enter into an agreement regarding who will be credited as authors. Willis did not testify that Morali said that Belolo made no contribution to the music, just that he regretted allowing him to be credited.[2]

Morali's comments about Belolo being a "crook" and a "fraud" do not appear to relate to Belolo being credited in connection with the works, but, rather, with Belolo's alleged failure to compensate Morali and Willis for exploitation of the works in France. Morali's lawsuit alleged that Belolo failed to obtain his consent and failed to compensate him in connection

---

[2] At one point in his deposition, Willis stated that Morali "regretted that he had ever let him take credit for – for– on the songs as being one of the creators of the works that he and I had done solely together." (Willis Dep. 20:6-9.) Arguably, the "solely together" remark is Willis's present day commentary regarding the creation of the compositions, not what Morali himself said in 1989.

with the release of a "Best of" album in France, which included re-mixed versions of the original Village People Recordings. (Willis Decl. ¶ 13.) Willis's French lawsuit alleged violation of his rights of publicity and misappropriation of his voice and image in connection with promotional music videos for the "Best of" album, which used a different singer lip-syncing to Willis's recordings. (Id.; Ex. E to Belolo Decl.) Neither lawsuit concerned whether Belolo was actually an author and owner of copyright.

When Willis stated that after he talked to Jacques, he realized for the first time that he had been "affected, per se, by his name being on there," and that through the lawsuit, he would be getting back whatever it was that was taken from him, Willis was not necessarily talking about copyright ownership. Willis could have meant that as a credited author, Belolo felt like he could do whatever he wanted with the works without answering to Willis or Morali. As already discussed, Willis's lawsuit in fact concerned Willis's publicity rights and use of his voice and image.

Willis's deposition testimony is not so compelling that no reasonable trier of fact could find other than that Willis knew of his claim to 50% copyright ownership in 1989. Furthermore, even assuming that Willis knew that he had a claim to 50% ownership in 1989, it is unclear from the record if, how, and/or when express repudiation of the claim took place.

Plaintiffs introduce evidence that Willis was aware, prior to 2009, that Belolo was openly taking credit for the lyrics. However, this evidence is contradicted by Willis. For example, Belolo attaches to his declaration a 2001 email allegedly from Willis in which Willis states: "Also I enjoyed reading your interview on the internet, the one where you told you had written the lyrics on the songs asking me mildly for help in correcting some of your grammar. Very enlightening!" (Ex. J to Belolo Decl.) Willis denies writing or sending this email and claims he never had an email account with that email address. (Willis Decl. ¶ 16.) Belolo also claims that in 2006, during the course of an interview, he explained to Karen Huff the song-writing process for the Village People songs and how he and Morali wrote the songs, to which Willis subsequently provided English lyrics. (Belolo Decl. ¶ 29.) In 2007, Ms. Huff married Willis. (Belolo Decl. ¶ 30.) Mrs. Willis (Huff) states in a declaration that Belolo did

not talk to her about the writing of the songs recorded by the Village People. (K. Willis Decl. ¶ 2.)

In sum, there are triable issues of material fact with respect to whether, more than three years prior to the commencement of this suit, Belolo plainly and expressly repudiated a claim by Willis to 50% ownership of the copyright interests in the 24 Disputed Works. Accordingly, Plaintiffs are not entitled to summary judgment based on the statute of limitations.

**B. Laches**

In addition to arguing that the counterclaim is barred by the three-year statute of limitations, Plaintiffs also argue that the counterclaim is barred by the equitable doctrine of laches. The standard for laches is different from that governing the accrual of copyright ownership claims. Therefore, it is possible that an ownership claim would be within the three-year statute of limitations yet still barred by laches.

The Ninth Circuit has held that laches may be asserted as a defense to an action seeking a declaration of co-authorship (resulting in co-ownership) of a copyrightable work. Jackson v. Axton, 25 F.3d 884, 887 (9th Cir. 1994), overruled on other grounds by Fogerty v. Fantasy, Inc., 510 U.S. 517, 531-32 (1994). To prevail on the affirmative defense of laches, a defendant must prove (1) an unreasonable delay by the plaintiff; and (2) prejudice. Kling v. Hallmark Cards, Inc., 225 F.3d 1030, 1036 (9th Cir. 2000).

However, the Circuits are split on whether and to what extent the defense of laches may be asserted in copyright cases. Other Circuits do not allow it, restrict the remedies to which it can apply, or only allow it in exceptional circumstances. See Petrella v. Metro-Goldwyn-Mayer, Inc., 695 F.3d 946, 958 (9th Cir. 2012) (W. Fletcher, concurring). In Petrella, the Ninth Circuit held that laches barred the claims of copyright infringement, unjust enrichment, and accounting that Paula Petrella, heir to writer Frank Peter Petrella, brought against defendants, who produced and distributed the movie Raging Bull. In October, the Supreme Court granted the Petition for Writ of Certiorari filed by Petrella. Petrella v. Metro-

Goldwyn-Mayer, Inc., 134 S. Ct. 50 (2013).  In her Petition, Petrella presents the question: "Whether the nonstatutory defense of laches is available without restriction to bar all remedies for civil copyright claims filed within the three-year statute of limitations prescribed by Congress, 17 U.S.C. § 507(b)." 2013 WL 1868355.  Oral argument is currently scheduled for January 21, 2014.

Because the availability and/or scope of the defense of laches in copyright cases is uncertain and before the Supreme Court, the Court denies Plaintiffs' motion without prejudice to the extent it is based on the defense of laches.  Plaintiffs may file a new motion for partial summary judgment on the ground of laches after the Supreme Court issues its opinion in Patrella.

### III. CONCLUSION

For the reasons discussed above, Plaintiffs Motion for Partial Summary Judgment [Doc. 80] is **DENIED**.[3]  To the extent the motion is based on the defense of laches, the motion is **DENIED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

DATED:  December 26, 2013

BARRY TED MOSKOWITZ, Chief Judge
United States District Court

---

[3] Because the motion is denied, the Court need not reach the issue of whether Willis's claim of 50% copyright ownership, raised as a defense to Plaintiffs' action, may be barred by the statute of limitations